IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ERIC A. ZARSKA,

                    Plaintiff,

                                        CIVIL ACTION
          vs.                           No. 02-3250-SAC

(FNU) WHITELY, et al.,


                    Defendants.


ORDER

     This matter is a civil rights action filed by a state
prisoner pursuant to 42 U.S.C. § 1983.  Plaintiff proceeds pro
se and submitted the full filing fee.

**Background**

     Plaintiff alleges the defendants, state corrections
officials and employees of Aramark Correctional Services,
violated his constitutional rights by engaging in religious
discrimination and retaliation causing him to receive an
inadequate vegetarian diet, interfering with outgoing correspon-
dence, pursuing improper disciplinary action against him, and
denying him a job assignment.

     Plaintiff was incarcerated at all relevant times at the El
Dorado Correctional Facility.

**Discussion**

**Motion for judgment on the pleadings**

The court first addresses the motion for judgment on the pleadings filed by defendants Bratton, Hopkins, and Buser (Doc. 160).[1]  These defendants seek dismissal of this action pursuant to the total exhaustion rule announced in Ross v. County of Bernalillo, 354 F.3d 1181 (10th Cir. 2004).  Under Ross, a prisoner must have administratively exhausted every claim presented in a lawsuit or risk dismissal of the lawsuit in its entirety without prejudice.  Id. at 1190.  Defendants point to a failure by the plaintiff to pursue administrative remedies on claims against Aramark Correctional Services.

Defendants correctly point out that plaintiff filed a motion in August 2005 seeking joinder of Aramark Correctional Services, Inc., as a defendant to this action and that nothing in the record demonstrates that plaintiff properly pursued administrative relief against Aramark on the claims in this matter.

In separate motions (Docs. 113 and 145), Aramark seeks its

---

[1]

Defendants filed a separate motion for leave to file this motion (Doc. 159), and both motions were docketed by the clerk of the court.  The motion for leave to file is granted.

dismissal from this action on the ground that service was not issued within the statute of limitations and on the ground that plaintiff failed to exhaust administrative remedies.  Aramark has moved to consolidate these motions (Doc. 149), and that motion is granted.

Plaintiff has responded and maintains that because he named individuals as employees of Aramark in his grievances and asserted claims against them in their individual and official capacities, he timely named Aramark as a defendant.

The court has considered these motions and plaintiff's response and concludes Aramark must be dismissed from this action.  Not only do the grievances cited by the plaintiff fail to convince the court that he presented claims against Aramark in his grievances, it is plain that he did not identify Aramark as a defendant until August 19, 2005 (Doc. 100), more than three years after he commenced this action and beyond the limitation period.  The court concludes the motion of Aramark for dismissal may be granted.[2]

However, because the plaintiff has exhausted claims against other defendants who were served in a timely manner, the court

---

[2]

In so ruling, the court takes note of plaintiff's request for voluntary dismissal of Aramark in the event the court finds a failure to exhaust administrative remedies against that defendant.  (Doc. 162, p. 4.)

denies the motions to dismiss this action that are based upon the <u>Ross</u> rule.  <u>See</u> <u>Alloway v. Booher</u>, 128 Fed. Appx., 705, 707 (10th Cir. 2005)(in the event of a mixed complaint, court may allow plaintiff to voluntarily dismiss unexhausted claims); <u>West v. Kolar</u>, 108 Fed. Appx. 568,  *2 (10th Cir. 2004)(same).

**I. Religious discrimination and retaliatory denial of adequate diet**

Plaintiff is a Seventh-day Adventist and was approved to receive a lacto-ovo-vegetarian diet.  He asserts that defendants Whitely, Severn, and Sanders, Aramark employees working at the prison in food service, retaliated against him because of his faith by failing to correct problems with his special diet and by various practices allegedly calculated to deny him an adequate diet, including replacing serving ladles with smaller sizes to reduce serving sizes, directing inmate employees to prepare less food than necessary to feed the inmate population and to water down juice  drinks, and making substitutions on vegetarian diet trays.[3]    He  asserts  these  actions  caused  nutritional

---

[3]

The claims against these defendants specifically assert animosity toward plaintiff's religious beliefs.  <u>See</u> Doc. 1, p. 3, Count 1: "Ms. Whitely ...retaliated against me because of my practices as a Seventh-day Adventist"; Doc. 5, p. 3, Ct. 1: "Defendant Severn...did...cause me to violate my religious beliefs through deception, in violation of my first amendment right...."; Doc. 8, p. 3, Ct. 1: "Defendant

deficiencies.  He also claims that on one occasion, he was served rice prepared with a meat base by defendant Severn.

It is settled that prisoners "do not forfeit all constitutional protections by reason of their conviction and confinement" and "clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987)(internal citation omitted).

This right includes the right to a diet compatible with a prisoner's sincerely-held religious beliefs. LaFevers v. Saffle, 936 F.2d 1117, 1119-20 (10th Cir. 1991).

On March 31, 2006, the court issued an order to show cause concerning the dismissal of certain claims set forth in this action (Doc. 153).  The order to show cause found that plaintiff had not identified discrepancies sufficient to support a claim of constitutionally significant deprivation of nutrition and noted that his weight fluctuated from a low of 234 pounds in August 1999 to approximately 249 pounds in October 2002, that his medical records did not reflect any evidence of malnutrition, and that he purchased items containing chicken, fish, and beef from the prison canteen on several occasions in 2002.

--------

Sanders...retaliate[] against me because of my practices as a Seventh-Day Adventist...."

Plaintiff filed a response (Doc. 156) and submitted several exhibits in support.  Included in these exhibits are a number of affidavits from inmates assigned to work in food service and from inmates receiving vegetarian diets.[4]

The materials submitted by the plaintiff, at most, suggest that inmates receiving vegetarian diets are fed at the end of the serving period and as a result, shortages of particular items sometimes occur.  These shortages, and the resulting substitutions, however, affect all vegetarian inmates, and the materials supplied to the court do not support a claim of retaliatory or discriminatory conduct based upon the plaintiff's religious faith.

While many of the affidavits secured by plaintiff complain of the amount and type of food served in the vegetarian diet, there is no evidence at all that plaintiff, or any other prisoner, has suffered more than dissatisfaction with the diet. This is an insufficient showing to support claims of religious discrimination or retaliation based upon plaintiff's religious affiliation.  Accordingly, the court concludes these claims must be dismissed.

Plaintiff also identifies two specific occasions on which he

---

[4]
Some, but not all, of these affiants follow a vegetarian diet due to their religious beliefs.

claims he was subjected to retaliatory conduct on the basis of his religion.

In the first incident, plaintiff claims defendant Whitely violated his rights on May 15, 2002, by preparing lunch trays that were missing food from the menu, contained inappropriate substitute items, and provided less food than required by the menu. (Doc. 1, p. 3.)

Plaintiff filed a grievance concerning this incident on May 17, 2002, alleging that Whitely had committed these actions in retaliation for plaintiff's pursuit of a vegetarian diet on religious grounds. (Doc. 19, Ex. A, p. 7.)

According to the grievance, the plaintiff ordered a tray because he could not be present for regular meal line. The regular meal line and alleged substitutions are as follows:

| Regular menu | Meal provided |
| --- | --- |
| 1 ½ c. pinto beans | 1 ½ c. pinto beans |
| 2 oz. shredded cheese | 1/3 oz. shredded imitation cheese |
| 1/4 c. shredded lettuce | 1/4 c. shredded lettuce |
| ½ c. rice | ½ c. rice |
| 2 slices bread | 2 tortillas |
| 1/3 oz. margarine | cake |
| ½ c. Mexican corn | |
| 1 fresh fruit | |
| 12 oz. fruit drink | |

(Id., p. 8.)

The response to this grievance states, in relevant part:

ARAMARK Food Service Director, Mr. Sanders spoke with
Ms. Whitely about the incident that occurred and she
indicates being approached by an officer and asked to
prepare a Styrofoam tray for an inmate.  She stated
having a line inmate prepare this meal as regular meal
line was running and that evidently the line inmate
prepared a regular tray. Ms. Whitely indicated she was
not intentionally trying to deprive you of your
vegetarian diet and that no one informed her that the
meal tray you received was wrong.

If the meal you received was wrong according to your
religious diet then it was your responsibility to let
the officer know it was the wrong tray or wrong food
items.  It is normal food service procedure that if an
inmate misses meal line he should receive a sack lunch.
Had you let the officer know about receiving the wrong
meal, he could have called food service and a vegetar-
ian sack lunch would have been provided to you.  It
would appear that there was a basic break down in
communication between yourself, the officer, and Food
Service supervisor, Ms. Whitely. (<u>Id</u>., p. 9.)

Plaintiff appealed to the warden, asserting the response was

"borderline retali[a]tory in nature...."  (<u>Id</u>., p. 6.)   The

response by the warden's designee determined that the matter had

been addressed in another grievance but noted that there did not

appear to be any retaliation. (<u>Id</u>., p. 3.)   The Secretary's

designee found that the response prepared by facility staff

acknowledged the tray was deficient but advised plaintiff on the

procedure to correct problems with meals.  No further action was

deemed necessary. (<u>Id</u>., p. 2.)

In the second incident, plaintiff alleges that on September

6, 2002, he was served rice containing a meat base.  Plaintiff

8

states that he was one of the last prisoners of the day to be served on the vegetarian diet line, and that he received and consumed Spanish rice.  Shortly afterwards, he was approached by another, unidentified inmate who advised plaintiff that he should not eat the rice.

According to plaintiff, the unidentified inmate stated that he had told defendant Severn that the vegetarian rice was needed, but she replied there was none and directed him to serve the rice with meat base to the vegetarian line.

Plaintiff filed a grievance against defendant Severn on September 9, 2002, claiming she intentionally deceived him, resulting in his deviation from a vegetarian diet.

On September 20, 2002, Unit Team Manager Bratton provided this response:

> I ... spoke with Mr. Sanders regarding your complaint. Mr. Sanders indicates discussing this matter with Food Service Supervisor Severn.  Ms. Severn reported the rice for the vegetarians was left in the food warmer and the incorrect rice was served.  When Ms. Severn became aware of this problem, the last inmates were being served.  Mr. Sanders has instructed Ms. Severn to inform the appropriate group of inmates in the event a situation like this occurs and to correct it on the spot by making sure the correct food items are served. Mr. Sanders apologizes for this incident and insures me the food service staff will do a better job insuring the correct items are being served to the inmates on special diets.  (Doc. 6, p. 13.)

The warden agreed with the response of the Unit Team, id.,

p. 10, and the Secretary's designee responded:

> The response provided to the inmate by the unit team
> and upheld by the warden indicates that the wrong pan
> of food was served on the day in question.  The
> response further indicates that actions have been taken
> to prevent recurrence of this problem.  The response
> provided to the inmate by staff at the facility is
> incorporated herein by reference and made part of this
> response.
>
> On appeal, the inmate offers no evidence or argument
> that suggests that the response rendered by staff at
> the facility is wrong.  Zarska does not offer any
> evidence that would suggest that the corrective action
> taken has been ineffective, nor does he offer any
> suggestion of what further relief it is that he
> believes might be appropriate.  (Id. at p. 8.)

The court's order to show cause found no evidence of any
action by defendant Severn arising from retaliation for plain-
tiff's religious beliefs.  Rather, the rice was served to all
prisoners receiving the vegetarian diet.

Next, the court noted that attachments to the Martinez
report reflect that plaintiff's canteen purchases showed that he
did not strictly adhere to a vegetarian diet during 2002,
suggesting that he suffered no cognizable injury from consuming
a single dietary item containing meat base.

In his response to the order to show cause, plaintiff points
out that he was entitled to receive a vegetarian diet, and he
contends the court erred in "rais[ing] the issue of sincerity"
(Doc. 156, p. 7).  The court, however, has made no finding on the

sincerity of plaintiff's beliefs.  Instead, the court directed
the plaintiff to show cause concerning whether his purchase, and
presumably, voluntary consumption, of meat products undermines
any claim of injury he suffered from being served a rice dish
containing meat base on a single occasion.[5]

Having considered the record, the court concludes it does
not support plaintiff's assertion that defendant Severn acted
with a retaliatory motive arising from any animosity to plain-
tiff's religion.

Likewise, to the extent plaintiff's complaints might be read
to assert a claim of cruel and unusual punishment based upon an
allegedly inadequate diet, the court concludes the record does
not support such a claim.

A prisoner is entitled to "nutritionally adequate food that
is prepared and served under conditions which do not present an
immediate danger to the health and well being of the inmates who
consume it."  Ramos v. Lamm, 639 F.2d 559, 570-71 (10th Cir.
1980).  To state a claim for relief for an insufficient diet, a
prisoner must assert both a "sufficiently serious" deprivation of

---

[5]

Plaintiff appears to concede that he consumed the products
he purchased, saying "[e]ven if the plaintiff did eat some
meat products in a time of 'backsliding in his faith' that
is not grounds to deny first amendment protection."  Id. at
p. 7.

the "minimal civilized measure of life's necessities" and deliberate indifference by officials to a "substantial risk of serious harm to an inmate." Barney v. Pulsipher, 143 F.3d 1299, 1310 (10th Cir. 1998)(quotations omitted).  The court finds no support for such a claim in the record.

First, as noted in the order to show cause, plaintiff's weight has increased during his incarceration in the custody of Kansas officials.   Next, plaintiff's institutional medical history does not reflect any physical symptom of malnutrition. Finally, none of the affidavits submitted by the plaintiff from other prisoners familiar with the vegetarian diet suggest medical inadequacy in that diet, either by weight loss or any health concern.   Compare Caldwell v. Caesar, 150 F.Supp.2d 50, 64-65 (D.D.C. 2001)(finding jury question presented regarding adequacy of diet; plaintiff noted to have low weight for his height); see also Dillard v. Washington, 1997 WL 305312, *4-5 (N.D. Ill. May 29, 1997)(finding claim of inadequate diet failed as a matter of law where there was no evidence plaintiff had ever complained of weight loss or suffering from malnutrition).

## II. Interference with outgoing correspondence

Plaintiff next alleges that defendant Buser, the prison mailroom supervisor, interfered with his ability to petition the government for redress of grievances by interfering with

certified mail addressed to defendant Sanders (Doc. 8, p. 19) and that she interfered with his ability "to give Notice of food/nutrient deprivation by service of process of Certified Mail, and create evidence of said Notice to be used in support of civil rights claims against Mr. Sanders...." (Id. at p. 27.) These claims arise from two separate incidents that are documented in the Martinez report.

In the first of these, plaintiff sent a letter to defendant Sanders at the prison by certified mail in late 2002. Defendant Buser signed the return receipt because she is the designated staff member for service of certified mail and placed the letter in the Aramark mailbox in the prison post office. Defendant Sanders cannot recall receiving the letter. Upon review of plaintiff's grievance concerning the processing of this mail, the facility reimbursed his account for the certified mail fee. (Doc. 41, Ex. M.)

The second episode occurred in early 2003, when plaintiff attempted to send a letter by certified mail to a former employee of Aramark Food Service. Defendant Buser seized the letter and sent it to the facility attorney for review. The letter then was sent to the prison's Intelligence and Investigation unit for review. That review found that plaintiff had circumvented mail procedure, and a disciplinary report was issued for violation of

13

K.A.R. 44-12-601.  Plaintiff was found guilty of the violation at a disciplinary hearing; however, that action later was dismissed by the warden.

The relevant grievance response provided the following explanation to the plaintiff:

> Ms. Buser indicates she was attempting to mail the item as legal mail due to the Withdraw Request, which was attached.  She attempted to verify the individual as an attorney however was unsuccessful.  Therefore, she indicates attempting to verify the individual as an attorney through Ms. St. Peters, Facility Attorney. The individual could not be verified and Ms. Buser indicates receiving instruction from Ms. St. Peters to submit the item to I & I for review due to the individual in which the mail was addressed to being a previous Aramark employee.  Lt. Harris inspected the mail.  The item was then returned to Ms. Buser and you received a disciplinary report for circumvention of mail procedures.  At the hearing CSI Hoover found you guilty.  However, the warden has since dismissed the disciplinary report.  The evidence has been returned to you and I have provided you with instructions on how to mail the letter certified registered mail in the future.  The disciplinary report will be removed from your records and the disposition of the hearing will be reversed. /s/ D.D. Bratton (Doc. 41, Ex. N.)

Prisoners have a First Amendment right to send and receive mail.  See Procunier v. Martinez, 416 U.S. 396, 408-409 (1974), overruled in part on other grounds by Thornburgh v. Abbott, 490 U.S. 401, 407 (1989); Treff v. Galetka, 74 F.3d 191, 194 (10th Cir. 1994).

While it is recognized that outgoing correspondence poses a

lesser threat to prison security than incoming correspondence, see Thornburgh, 490 U.S. at 411, prisons may regulate outgoing mail provided this "furthers one or more of the substantial governmental interests of security, order, and rehabilitation" and is "generally necessary" to protect those penological goals. Procunier, 416 U.S. at 413-14.  The regulation of prison mail that is not privileged "is essentially an administrative matter in which the courts will not intervene."  United States v. Gordon, 168 F.3d 1222, 1228 (10th Cir. 1999).

Under the Kansas Administrative Regulations, outgoing official, legal, or privileged mail sent by a prisoner is not to be censored or read absent authorization by the warden.  K.A.R. 44-12-601 (g).  Legal mail is defined as "mail affecting the inmate's right of access to the courts or legal counsel" and includes correspondence to "any lawyer, a judge, a clerk of a court, or any intern or employee of legal services for prison-ers".  K.A.R. 44-12-601 (a)(1)(A).  Official mail is "mail to an official of the state or federal government who has authority to control, or to obtain or conduct an investigation of, the custody or conditions of confinement of the inmate", K.A.R. 44-12-601(a)(1)(B); privileged mail is defined as mail between the prisoner and the prisoner's physician, K.A.R. 44-12-601(a)(1)(C).

In both instances, the plaintiff's mail was processed in the

15

ordinary course in the prison mailroom.  It does not appear that either item was readily identifiable as legal, official, or privileged mail, and it was reasonable for officials to examine the items to determine whether they qualified for special handling.

To the extent plaintiff complains that defendant Buser signed for certified mail addressed to defendant Sanders, he states no constitutional violation.  Moreover, after studying the record, the court finds no injury to the plaintiff has been shown.  First, his claims in this action concerning religious discrimination affecting his diet have not been undermined by the absence of Sanders' signature on the return receipt.  Next, it is evident that he had the opportunity to meet personally with Sanders on at least some occasions to discuss his concerns.  See, e.g., Doc. 13, p. 9.  Finally, upon investigation of his complaint, the facility reimbursed him for the expense of certified mail.

In the second incident, plaintiff's mail was seized and investigated due to his attempt to contact a former employee of the prison food service contractor.  Again, the record does not reflect any injury to the plaintiff.  The disciplinary action was overturned by the warden, the letter was returned to the plaintiff, and plaintiff was counseled on how to mail the letter

16

in the future.

**III. Improper disciplinary action and denial of job**

In his first amended complaint (Doc. 3), plaintiff asserts claims of retaliation, interference with the grievance procedure, and violations of due process against defendants Bratton, a Unit Team Manager, and Hopkins, the Job Coordinator.

The facts, as set forth in the complaint, are as follows: Cts. 1 and 6:   On July 29, 2002, plaintiff gave defendant Bratton a grievance in which he complained that C.O. Weber had lied to harm him.   Plaintiff requested removal from the work area supervised by Weber.

Bratton responded on August 8 but did not directly address plaintiff's allegation concerning Weber.

Cts. 2 and 7:  On August 14, 2002, plaintiff filed a grievance against defendant Hopkins claiming she terminated his job as visitation porter to retaliate against him for filing a grievance against C.O. Weber and lied to conceal this retaliation by stating he would not be considered for that job.

Plaintiff supports the claims that he was hired by Hopkins for the position on August 5, 2002, by submitting an Alpha Roster and a Drop Sheet showing he was hired as visitation porter on August 5, 2002.   As proof of his claim that Hopkins lied to conceal the termination, he cites a grievance response prepared

17

by her on August 6, 2002, in which she states he will not be considered for the visitation porter position.

Cts. 3 - 5, 8 - 10: On August 8, 2002, plaintiff accepted a summary citation for a work performance violation following his resignation from a job as chaplain's clerk.  On August 6, 2002, defendant Bratton placed plaintiff on level I status for 120 days.  Defendant Bratton used the allegedly retaliatory termination of plaintiff from the visitation porter job to require plaintiff to complete 120 days of good work performance before the level I status would be removed.  Plaintiff alleges defendant Bratton committed this retaliation in an effort to chill his use of the grievance procedure.

Plaintiff claims defendant Bratton acted in concert with defendant Hopkins by claiming there was an administrative decision not to hire him.

On August 21, 2002, plaintiff filed a grievance against defendant Bratton claiming she had improperly protected Weber and Hopkins from responding to plaintiff's claims against them. Plaintiff also claimed Bratton and Hopkins acted in concert to misrepresent his job termination and used that termination to increase his level one status as retaliation for plaintiff's pursuit of a grievance against Weber.

On August 23, 2002, plaintiff was removed from level one

status and returned to level three status. Plaintiff alleges this action was taken following his notice that he intended to pursue legal action.

Cts. 11 - 16: On July 29, 2002, plaintiff asked defendant Hopkins to assign him as the visitation porter.  On August 5, 2002, he was called into the office of Unit Team Dutton to discuss the grievance he filed against Weber.  At that meeting, Dutton told plaintiff he was hired as the visitation porter. Plaintiff asked when he should report to work, and Dutton contacted defendant Hopkins by telephone.  Hopkins allegedly told Dutton plaintiff could start on the following day, August 6, 2002.  Dutton and Hopkins then began to discuss plaintiff's grievance against Weber, and Dutton asked plaintiff to leave to the room.

On August 6, 2002, Dutton called plaintiff into his office and advised him that he was no longer assigned to the visitation porter position and was layed-in with cause.

That evening, plaintiff received a grievance response prepared by defendant Hopkins which stated he would not be considered for the visitation porter position.  Plaintiff contends this is incorrect, citing the Alpha Roster and Drop Sheet which show his assignment as the visitation porter.

Plaintiff claims defendant Hopkins tried to conceal his

termination by her response to his grievance.  He asserts that defendant Hopkins' actions of hiring and terminating him and concealing these events are retaliation for his grievance against Weber.

The Martinez report in this matter shows plaintiff received a summary judgment citation on August 2, 2002, for violating K.A.R. 44-12-401, *Work performance*.  The citation was based upon plaintiff's quitting a job due to a conflict with a security officer.  Plaintiff did not contest the citation and agreed to a fine of $5.00.  Plaintiff claims that after he accepted the citation, his level was reduced but later was reinstated after he threatened to take legal action.

It is uncontested that prisoners who accept summary judgment citations are not subject to reduction in level.  Defendant Bratton states that upon review of the action, officials reinstated plaintiff to his earlier level.

Plaintiff, however, contends that he filed a grievance against defendant Bratton challenging her response to a grievance he filed against C.O.I Weber, and that he filed another grievance against defendant Hopkins for terminating him from a job as the visitation porter.

Plaintiff's grievance against defendant Bratton accuses her of failing to respond to his claim that Weber lied to harm him.

Plaintiff also challenged Bratton's response to his grievance
against Hopkins.

Bratton's response to plaintiff reads:

On 8/2/02 you received a Summary Judgment report for
informing your supervisor you no longer were going to
work at the assignment.   During the time you were
employed in the programs area you failed to comply with
various security procedures and became upset when staff
would address you regarding these procedures.   In view
of the disciplinary actions and you being uncooperative
regarding    security    procedures    an    Administrative
decision was made to not hire you in a different job at
that time.   This was not a retaliatory decision.   The
visitation area is a high profile assignment in view of
the contact with the public.   It is important individu-
als who are assigned to the area be cooperative and
follow directives given by staff.   At the time of the
incident you were not considered as  a good candidate
to be assigned to the visitation area.   (Doc. 41, Ex.
I., p. 6.)

Gary   Wilson,   Bratton's   supervisor,   responded   to   the
grievance   against   her   and   concluded   that   her   responses   to
plaintiff's   grievances   were   not   retaliatory   and   provided   a
detailed explanation of the action taken.

Plaintiff appealed from the response, and the Secretary of
Corrections' designee replied, in part:

Decisions concerning assignment of inmates to jobs and
cell locations are necessarily left to the judgment and
discretion of facility staff, and those decisions will
not be disturbed unless there is a showing of illegal
motivation or activity.

Mr. Zarska offers no evidence suggesting the facility's
decisions in this matter were due to illegal grounds.
His grievance consists solely of unsupported conclusory

remarks.  (Ex. H, p. 1.)

It is settled that "prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights.... An inmate claiming retaliation must allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights." Fogle v. Pierson, 435 F.3d 1252, 1263-64 (10th Cir. 2006)(quoting Peterson v. Shanks, 149 F.3d 1140, 1144 (10th Cir.1998)).

"Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." Poole v. County of Otero, 271 F.3d 955, 960 (10th Cir. 2001)(internal quotation marks omitted).

A prisoner's filing of an administrative grievance is protected by the First Amendment. Williams v. Meese, 926 F.2d 994, 998 (10th Cir.1991).  Accordingly, prison officials may not retaliate against a prisoner for pursuing administrative or legal remedies.  Smith v. Maschner, 899 F.2d 940, 947 (10th Cir.1990).

However, a prisoner is not "inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he is engaged in protected activity." Peterson v. Shanks, 149 F.3d 1140,1144 (10th Cir.

22

1998).

As the Fifth Circuit Court of Appeals has noted:

The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties.  Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every ... act that occurs in state penal institutions.  <u>Woods v. Smith</u>, 60 F.3d 1161, 1166 (5th Cir. 1995).

In the Tenth Circuit, a prisoner advancing a claim of retaliation "must prove that but for the retaliatory motive, the incidents to which he refers ... would not have taken place." <u>Peterson</u>, <u>id</u>. (quotations and citation omitted).  "An inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." <u>Id</u>. (internal quotation marks and citation omitted) (emphasis in original).

Circumstantial evidence, such as a chronology of events or suspicious timing, may be presented to support a claim of retaliatory conduct.  <u>See</u> <u>Smith</u>, 899 F.2d at 949 (holding that plaintiff prisoner had supported claim of retaliation by "circumstantial evidence of the suspicious timing of his discipline, coincidental transfers of his witnesses and assistants").

The court has examined plaintiff's claims concerning disciplinary action and denial of assignment as a visitation porter and concludes they are sufficiently specific and detailed to avoid summary dismissal.  Accordingly, the court will direct the filing of an additional responsive pleading by defendants Bratton and Hopkins to address these claims.

## IV.  Motions for reconsideration and relief from judgment

Two motions filed by plaintiff remain to be considered, namely, a motion for reconsideration (Doc. 132) and a motion for relief from judgment (Doc. 151).

Plaintiff's motion for reconsideration (Doc. 132) seeks relief from the court's order of October 27, 2005 (Doc. 128).  He challenges the court's decision to grant the request of defendant Sanders to seal documents containing his personal address information and to prevent the plaintiff from mailing any additional pleadings to his residence.  Defendant Sanders advised the court that he is able to view documents recorded electroni- cally in the court's docket, and the court concluded he had made an informed decision to waive service of the pleadings.

It is axiomatic that "'[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution..which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'"

<u>Chambers v. Nasco, Inc.</u>, 501 U.S. 32, 43 (1991)(quoting <u>United States v. Hudson</u>, 7 Cranch 32, 34 (1812)).

Here, the defendant requested that plaintiff be prevented from contacting him by mail pursuant to K.A.R. 44-12-601(p), which makes it unlawful for an inmate to correspond with one who has filed a written objection with the warden.  The order of the court does not impede plaintiff from filing documents in this matter.  Although plaintiff contends that he may be subjected to false disciplinary charges as a result of that decision, the court finds his assertion of exposure to future injury is speculative.  Likewise, although plaintiff claims that the court's order fails to provide for any means to conduct discovery, he does not appear to actually seek discovery.  The court finds no basis to modify the order and will deny the motion for reconsideration.

Plaintiff also has filed a motion for relief from judgment (Doc. 151) from the court's order denying his motion to alter or amend the dismissal of defendant Hoover from this action.  Defendant Hoover's sole action in this matter was his decision finding plaintiff guilty of a violation of mail procedures.  In dismissing defendant Hoover, the court noted that plaintiff's claim against him was based upon the fact that the disciplinary action against plaintiff was overturned by the warden.

25

The dismissal of a disciplinary action does not establish that the hearing officer acted unconstitutionally, as the inquiry is whether the finding is supported by "some evidence in the record." Superintendent, Mass. Corr. Inst., Walpole v. Hill, 472 U.S. 445, 454 (1985).   In support of this, the court cited McQuillion v. McKenzie, 35 Fed. Appx. 547, 2002 WL 1003134, *2 (9th Cir. 2002).   In that case, the United States Court of Appeals for the Ninth Circuit upheld a district court decision granting summary judgment to a disciplinary hearing officer sued by a prisoner after the disciplinary hearing was overturned by the warden.   The court found the fact of a reversal was insufficient to establish that the hearing officer lacked evidence to support the conclusion that disciplinary action against the plaintiff had a legitimate penological purpose.

Plaintiff bases his motion for relief upon a Tenth Circuit decision issued in Zarska v. Higgins, 171 Fed. Appx. 255, 2006 WL 689449 (10th Cir. March 20, 2006).   In that case, plaintiff alleged that a corrections officer filed a disciplinary report in retaliation for plaintiff's affidavit in support of another prisoner charged in a disciplinary action and then refused to withdraw the disciplinary report even though he knew it lacked foundation.   The appellate court rejected that argument, finding that the dismissal did not provide a remedy for the action but

only "prevented the harm to Mr. Zarska caused by those actions from being greater than it already was." Id. at *4.

Having considered plaintiff's motion for relief, the court finds no reason to reinstate his claim against defendant Hoover. First, unlike the defendant in Zarska v. Higgins, defendant Hoover did not initiate action against the plaintiff, and there is no evidence, such as a chronology of events, which supports plaintiff's assertion of retaliation by defendant Hoover. Instead, defendant Hoover's acts are those demanded by his position as a hearing officer: controlling the disciplinary hearing, examining the evidence, and entering a decision.

The information contained in the hearing record shows the testimony offered before defendant Hoover included statements from the mailroom supervisor and a representative of the internal investigative unit, which determined that a violation had occurred. Plaintiff was allowed to testify and questioned the witnesses against him. It is clear that defendant Hoover's decision was supported by some evidence. (Doc. 19, Ex. J., p. 8.)

## Conclusion

For the reasons set forth, the court dismisses plaintiff's claims alleging religious discrimination resulting in the provision of an inadequate diet and unconstitutional interference

in the processing of mail.  The court directs the filing of a responsive pleading by defendants Bratton and Hopkins to address plaintiff's remaining claims alleging retaliation in the initiation of a disciplinary action and the denial of assignment as a visitation porter.

IT IS, THEREFORE, BY THE COURT ORDERED the motions to dismiss filed by Aramark (Docs. 113 and 145) are granted, and the motion to consolidate these motions (Doc. 149) is granted.

IT IS FURTHER ORDERED plaintiff's motion for reconsideration (Doc. 132) is denied.

IT IS FURTHER ORDERED plaintiff's motion to extend service time limits (Docs. 133) is denied as moot.

IT IS FURTHER ORDERED plaintiff's motion for an initial order regarding planning and scheduling (Doc. 141) is denied without prejudice.

IT IS FURTHER ORDERED plaintiff's motion for relief from judgment (Doc. 151) is denied.

IT IS FURTHER ORDERED the motion for leave to file a motion for judgment on the pleadings (Doc. 159) is granted.

IT IS FURTHER ORDERED the motion for judgment on the pleadings (Doc. 160) is denied.

IT IS FURTHER ORDERED defendants Bratton and Hopkins are granted 45 days to file a responsive pleading on the merits of

plaintiff's claims concerning disciplinary action and the denial of a work assignment.

IT IS FURTHER ORDERED the remaining claims and defendants are dismissed from this action.

Copies of this order shall be transmitted to the parties.

**IT IS SO ORDERED.**

Dated at Topeka, Kansas, this 26th day of September, 2006.


S/ Sam A. Crow
SAM A. CROW
United States Senior District Judge